## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiffs, | **8:23CR39** |
| vs. | |
| ALEXAS DAVIS, | **FINDINGS AND RECOMMENDATION** |
| Defendants. | |

This matter is before the Court on Defendant's Motion to Suppress Statement (Filing No. 60) and Motion to Suppress Search of Phone (Filing No. 62). An evidentiary hearing regarding the motions was held on September 5, 2023. A transcript has been filed and the motions are now ripe for disposition.

For the reasons explained below, the undersigned will recommend that Defendant's motions be denied.

### FACTS

Omaha Police Detective Lisa Horton ("Detective Horton") has worked for the Omaha Police Department for approximately sixteen years and is presently assigned to the special victim's unit. (TR. 4-5.) She has also been on a human trafficking task force with the FBI for approximately three years. (TR. 4-6.) In the past, Detective Horton has been assigned to the uniform patrol bureau and the burglary unit with the Omaha Police Department. (TR. 4.) Detective Horton received training at the law enforcement academy in Nebraska. (TR. 4-5.) As part of that training, Detective Horton received training on alcohol-related crimes, including driving under the influence of alcohol. (TR. 4-5.) Detective Horton has also received training on field sobriety tests

and the observation of impairment from alcohol and drugs.  (TR. 5.)  Detective Horton testified that over her career, she has observed individuals under the influence of alcohol and other controlled substances.  (TR. 5.)

On March 2, 2023, Detective Horton was in Wichita, Kansas as part of a federal task force investigation.  (TR. 6.)  She was working with Wichita police on the matter.  (TR. 6.)  Detective Horton testified that she was in Wichita to locate Defendant on a federal warrant.  (TR. 6.)  Local police were able to find Defendant during a traffic stop in Wichita.  (TR. 7.)  Detective Horton stated she was in the area of the traffic stop, and that she received updates on the status of the stop as it occurred.  (TR. 7.)  Detective Horton was in a police vehicle with Omaha Police Detective Jeff Shelbourn ("Detective Shelbourn") at the time.  (TR. 22-23; TR. 53; TR. 65.)

Following the stop, Defendant was transported to the Wichita Police Department by another officer.  (TR. 7; Ex. 3.)  Detective Horton stated that Defendant was in a small interview room at the Wichita Police Department when Detective Horton arrived.  (TR. 7-8.)  Detective Horton testified that the interview room had a table and three chairs.  (TR. 8; Ex. 3.)  Detective Horton testified that she interviewed Defendant and Detective Shelbourn was also present at the time. (TR. 8.)  Detective Horton stated that the interview began shortly after the traffic stop, at around 10:30-11:00 a.m.  (TR. 9.)  Detective Horton testified that she had never conducted an interview at the Wichita Police Department before.  (TR. 7.)

Detective Horton testified that she read Defendant her *Miranda* rights aloud, using a form and Defendant signed the form.  (TR. 8; TR. 31; Ex. 1.)  Detective Horton stated she provided Defendant her *Miranda* advisement within the first few minutes of the interview.  (TR. 32.)  Detective Horton testified she began the interview with introductions, which was before the *Miranda* advisement, but that she does not recall any other pre-*Miranda* conversations with Defendant.  (TR. 32.)  Detective Horton testified Defendant did not ask any questions about her *Miranda* advisement and did not request an attorney.  (TR. 33-34.)  Detective Horton stated that she asked Defendant if she wanted to speak to her and Defendant said "Yes."  (TR. 34.)  Detective Horton testified she did not tell Defendant she was under arrest because Defendant was under arrest before Detective Horton arrived for the interview.  (TR. 32; TR. 49.)  Detective Horton testified that it is her normal practice to tell someone they are under arrest when they are arrested, but that she did not arrest Defendant.  (TR. 49.) Detective Horton did not hear anyone tell

2

Defendant she was under arrest. (TR. 33.) Detective Horton stated Defendant indicated during the interview that she was involved in the commercial sale of sex with several other individuals, including the minor victim in this case. (TR. 10-11.)

Detective Horton testified that she did not notice any indicators that Defendant was impaired by alcohol or another controlled substance during the interview. (TR. 9-10.) Detective Horton stated she could not recall whether she asked Defendant if she was under the influence of drugs or alcohol, but that it is common practice for her to do so in interviews. (TR. 44.) Detective Horton testified that Defendant never told her she was intoxicated or under the influence of any substance. (TR. 13.) Detective Horton testified Defendant appeared to understand questions and answered questions appropriately. (TR. 10.) Detective Horton testified Defendant was able to provide details in her responses to questions about other individuals involved in the commercial sale of sex. (TR. 10-11.) Detective Horton stated Defendant never requested to go to the hospital or to receive medical treatment. (TR. 13.)

Detective Horton testified she never indicated to Defendant that it would go better for Defendant if she talked to Detective Horton. (TR. 36.) Detective Horton stated she did not make Defendant any promises but acknowledged that expressing the importance of honesty is something she typically does in interviews. (TR. 36-37.) Detective Horton testified that she does not believe she took note of Defendant's educational level in the interview. (TR. 43.) Detective Horton did take some note of her family background. (TR. 43-44.) Detective Horton described her interview with Defendant as conversational. (TR. 49-50.)

Detective Horton testified that she received training in interview techniques at the Omaha Police Department, including FETI training which is related to interviewing victims in traumatic situations. (TR. 34-35.) Detective Horton testified she did not use a specific interviewing technique with Defendant. (TR. 35-36.) Detective Horton stated she used direct questions in the interview with Defendant because there was very specific information discussed. (TR. 37-38.) Detective Horton testified that in interviewing Defendant, she explained the situation, what was being investigated, and then asked questions about Defendant's involvement in the investigation. (TR. 35.) Detective Horton testified that Defendant's interview lasted approximately an hour to an hour and a half. (TR. 9; TR. 57.)

Detective Horton testified that following the interview, she asked Defendant if she would consent to the search of her phone.  (TR. 11; TR. 37.)  Detective Horton stated that Defendant agreed to the search and signed a consent to search form.  (TR. 11; Ex. 2.)  The consent form indicated that Defendant was advised of her right to refuse consent and that officers told her that if she voluntarily consented to the search, anything discovered could be used against her.  (Ex. 2.)  The consent form provided, right above Defendant's signature, that Defendant was voluntarily and intentionally consenting to allowing officers to search her property, and that her consent was being freely given and was not the result of any promises, threats, coercion, or intimidation.  (Ex. 2.)  The second page of the consent form asked Defendant to provide the passcode for her phone, which Defendant provided.  (TR. 58; Ex. 2.)  Defendant signed the second page of the consent form below the request for the phone's passcode.  This part of the consent form indicated that consent could be withdrawn at any time.  (Ex. 2.) The consent form indicates it was signed at 12:00 p.m.  (TR. 30; Ex. 2.)  Detective Horton testified that she either used her phone or watch to record the correct time, but she could not recall which one.  (TR. 30.)

Detective Horton testified that when the interview was over, Agent Worster informed her the interview had not been recorded.  (TR. 12-13; TR. 28.)  Detective Horton stated she did not know the interview had not been recorded until the interview was over.  (TR. 12-13.)  Detective Horton testified that once she learned the interview was not recorded, she wrote a report detailing the interview while it was fresh in her memory.  (TR. 13.)  Detective Horton testified she did not take notes during the interview but that she made notes after the interview before she prepared her report.  (TR. 14-15; Ex. 101.) Detective Horton prepared her report at approximately 3:20 a.m. on March 3, 2023.  (TR. 38.) Detective Horton testified she does not recall where she was when she prepared the report or why she was up at such an early time.  (TR. 39-40.)  Detective Horton stated her report was a summary of the interview.  (TR. 44.)

Detective Horton testified that she received training about writing reports while she was in the police academy and has had continuing education in police report writing.  (TR. 29.)  Detective Horton testified she was taught to note the beginning and ending times of an interview on a report, but that she did not do so in this case because she thought the interview was being recorded and she tries to take minimal notes during an interview.  (TR. 29.)

Detective Horton testified she did not notice the button on the outside of the interview on the switch plate that said "recording," so she did not check to see if the button had been pushed before the interview. (TR. 26-28; Ex. 102.) Detective Horton stated that no one told her before she went into the interview room that the recording system was not working. (TR. 28.) Detective Horton testified that she was not given an orientation at the Wichita Police Department as to how things worked. (TR. 49.) Detective Horton stated she generally records interviews when she conducts them in Omaha. (TR. 13.) Detective Horton explained that in Omaha, there is a room with monitors and a button to push for the adjoining interview room. (TR. 26.) If you push the button, audio and video begin recording. (TR. 26.) Detective Horton testified that she did not ask if there was a similar recording system in Wichita. (TR. 26.) Detective Horton testified that she just assumed the interview was being recorded because it is common practice in Omaha for an officer to push the button for recording when someone is placed in an interview room. (TR. 26.) Detective Horton testified the interviewing officer or transporting officer generally pushes the recording button in Omaha. (TR. 27.) Detective Horton stated she did not speak with the transporting officer in this case. (TR. 27.)

Detective Horton testified that Detective Shelbourn had a laptop with him in the interview room. (TR. 30-31.) Detective Horton stated the laptop was used to show Defendant conversations that had occurred between her and her co-defendant on a PowerPoint that had been prepared by Agent Worster. (TR. 30-31.) Detective Horton believed the messages were made through Facebook. (TR. 42.) Detective Horton could not recall whose account was used for the messages. (TR. 42-43.) Detective Horton testified that she believes Defendant had a Facebook account but did not know for certain because Agent Worster investigated that portion of the case. (TR. 42.) Detective Horton acknowledged that her report states "[Defendant] later stated she was aware that [minor victim 1] was under 18 and recalled that [minor victim 1] could never get into clubs because she did not have an ID." (TR. 45.) Detective Horton could not recall if that information came from a specific question that Defendant was asked, or whether the topic just came up during the interview. (TR. 45.)

Detective Shelbourne also testified at the evidentiary hearing. He testified he has been employed with the City of Omaha Police Department for a little over sixteen years but has worked in law enforcement for roughly twenty-one or twenty-two years. (TR. 53.) He stated he is

5

presently assigned to the special victim's unit but has previously been assigned to uniform patrol. (TR. 53.)  He is also assigned to the human trafficking federal task force.  (TR. 54.) Detective Shelbourne testified that as part as his career, he received training regarding intoxication-related crimes, including driving under the influence of alcohol and detecting and observing signs of impairment.  (TR. 53-54.)  He stated he has also received training regarding impairment under other controlled substances.  (TR. 54.)  Detective Shelbourne testified that over his career, he has had the opportunity to observe people under the influence of alcohol and other controlled substances.  (TR. 54.)

Detective Shelbourne acknowledged he was involved in Defendant's interview at the Wichita Police Department. (TR. 55.) He stated he had never conducted an interview in Wichita before that time.  (TR. 55.)  Detective Shelbourne testified that when he arrived at the Wichita Police Department, Defendant was seated in a small interview room.  (TR. 55-56.)  He explained that Defendant was seated with her back against the back wall and that Defendant was handcuffed to the table.  (TR. 55-56.)  Detective Shelbourne testified Defendant had been handcuffed by the Wichita police.  (TR. 56; Ex. 3.)  Detective Shelbourne testified that Detective Horton sat at the table with Defendant, and that he sat in a chair in the back corner of the room.  (TR. 56.)  Detective Shelbourne stated Defendant was read her *Miranda* rights at the beginning of the interview, and that Defendant waived her *Miranda* rights and agreed to speak to them.  (TR. 56.) Detective Shelbourne testified that Defendant never asked for a lawyer or indicated that she wanted to terminate the interview.  (TR. 56.)

Detective Shelbourne testified that he did not observe any indication that Defendant was impaired by alcohol and that Defendant never said she was under the influence of alcohol.  (TR. 56-57.)  Detective Shelbourne stated he did not observe any indications that Defendant was under the influence of any other controlled substance and that Defendant did not tell them she was under the influence of any controlled substance.  (TR. 57.) Detective Shelbourne testified he did not recall whether he asked Defendant if she was under the influence, but that it is common practice to do so.  (TR. 73.)

Detective Shelbourne testified that Detective Horton mainly asked Defendant questions, but that he also asked questions.  (TR. 57.) Detective Shelbourne testified he has been trained on interviewing techniques.  (TR. 74.) Detective Shelbourne acknowledged that he used his laptop to

show Defendant things during the interview.  (TR. 57-58.)  He stated Defendant was able to explain things that were shown to her, and that Defendant appeared to understand what was being asked.  (TR. 57-58.)  Detective Shelbourne testified that Defendant's responses to questions were appropriate, coherent, and detailed.  (TR. 58.)  Detective Shelbourne described the tone of the interview as cordial.  (TR. 58.)  Detective Shelbourne testified he was present for the entirety of the interview.  (TR. 57.)

Detective Shelbourne testified that he thought Defendant's interview in Wichita was being recorded and that he learned from Agent Worster that it had not been recorded when the interview was over.  (TR. 59.)  Detective Shelbourne testified he thought the interview was being recorded because there was a camera in the room.  (TR. 68.)  Detective Shelbourne stated he did not notice there was a button outside the doorway of the interview room to start the recording.  (TR. 68-69.)  Detective Shelbourne stated that Agent Worster told him following the interview that the recording equipment was not working. (TR. 59.) Detective Shelbourne testified that Agent Worster had been notified that the recording system was not working before the interview but did not pass that information along until the interview was over.  (TR. 70.)

Agent Shelbourne testified that once they learned the interview had not been recorded, they decided that Agent Horton would prepare an immediate supplementary report, so the interview was fresh in their minds.  (TR. 59.)  Agent Shelbourne testified that he read Agent Horton's report and that it was accurate.  (TR. 59.)  Detective Shelbourne testified that when he interviews people in Omaha, he typically records the interview.  (TR. 58-59.)  He explained that the Omaha police station has a room with monitors and that there is a red button that you push to activate the audio-video recording for an interview room.  (TR. 59.)

## DISCUSSION

Defendant has moved the Court to suppress the statements she made during her interview following her arrest.  Defendant has also moved to suppress the evidence seized by virtue of the search of her iPhone 12 cellular telephone.  For the reasons set forth below, the undersigned will recommend that Defendant's motions be denied.

### 1. Statements

Defendant argues the statements she provided during the interview should be suppressed because she was intoxicated at the time of the interview.[1] "Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by their maker. A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (internal quotations and citations omitted). "The appropriate test for determining whether a statement or confession is voluntary is whether the alleged statement or confession was extracted by threats, violence, or direct or indirect promises, such that [an individual's] will is overborne and his . . . capacity for self-determination critically impaired." *United States v. Gipp*, 147 F.3d 680, 683 (8th Cir. 1998) (internal quotation omitted).

In making the voluntariness determination, courts consider "the totality of the circumstances," and assess "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995). Factors taken into consideration in performing this assessment include: (1) the suspect's age; (2) the suspect's intelligence and education; (3) whether the suspect was intoxicated or under the influence of drugs; (4) whether the suspect consented after being informed of his right to withhold consent or his *Miranda* rights; and (5) whether the suspect, because of having been previously arrested, was familiar with the protections afforded by the legal system. *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008). Importantly, intoxication does not automatically render a confession involuntary. *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990); *United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008). Rather, the test is whether such intoxication caused the individual's will to be overborne. *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008).

Likewise, a defendant's waiver of his *Miranda* rights must be made voluntarily, knowingly, and intelligently. *United States v. Duran*, 109 F. Supp.3d 1093, 1102 (D. Minn. 2015). In evaluating whether a waiver was made voluntarily, knowingly, and intelligently, courts examine (1) whether the waiver was the product of a free and deliberate choice rather than intimidation,

---

[1] Defendant's brief indicates the traffic stop occurred at 3:20 a.m. However, Defendant's brief also indicates the reports Defendant received did not include a lot of information or detail about Defendant's arrest. The testimony at the hearing showed Defendant's interview started at 10:30 or 11:00 a.m., and that her arrest was shortly before that.

coercion, or deception and (2) whether the suspect waived his rights with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id*.

There is nothing in the record to suggest Defendant's statements were involuntary, or that Defendant was intoxicated at the time of the interview or when she waived her *Miranda* rights. The detectives each testified that Defendant was advised of her *Miranda* rights at the onset of the interview and agreed to speak to them. They described their interaction with Defendant as conversational and cordial. Both Detective Horton and Detective Shelbourne, who have each received training regarding the detection of intoxication, testified that Defendant did not appear to be intoxicated and did not tell them she was intoxicated. They also testified that Defendant appeared to understand questions being asked and was able to provide detailed responses to questions. *See United States v. Saul*, No. 8:09CR386, 2010 WL 2682801, at *2 (D. Neb. July 2, 2010) ("Speaking coherently and in a manner indicating an understanding with what is happening suggests lack of intoxication."); *United States v. Harris*, 64 F.4th 999, 1002 (8th Cir. 2023) (concluding that the district court did not err in finding there was no evidence that the defendant's alleged intoxication caused his will to be overborne, while noting that the district court credited officers' testimony that the defendant appeared coherent and did not tell the officers he was intoxicated or under the influence of drugs). Additionally, video evidence offered at the hearing of Defendant's transportation to the Wichita Police Department shows that Defendant was talking and asking relevant questions. The video also shows Defendant being taken to the interview room. She appeared to be walking normally and following the directions of the officer, further indicating a lack of intoxication. Having observed and heard the testimony at the evidentiary hearing, the undersigned finds the detectives' testimony entirely credible. The evidence does not support the conclusion that Defendant was intoxicated or that any intoxication caused her will to be overborne as to render her statements involuntary.

Likewise, there is also no evidence that Defendant's *Miranda* waiver was not made voluntarily, knowingly, and intelligently, or that her statements were coerced by threats, violence or promises. Defendant signed a *Miranda* waiver, did not ask questions about the waiver, and stated she was willing to answer questions. Detective Horton testified that Defendant did not attempt to terminate the interview or request a lawyer. The totality of the circumstances shows

Defendant waived her *Miranda* rights voluntarily, with a full awareness of both the rights being abandoned and the consequences of her waiver.

Defendant also argues her statements should be suppressed because there is no electronic recording of the interview. Defendant claims both Nebraska and Kansas state law require that these interviews be recorded. The problem, however, is that Defendant's interview occurred as part of a federal investigation. While some states require such recordings as a matter of state law, "there is no indication that such laws are constitutionally required." *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005) (declining to mandate that tape-recording equipment be used in formal interrogation settings); *United States v. French*, 719 F.3d 1002, 1007 (8th Cir. 2013) (finding district court properly denied motion to suppress because the Constitution does not mandate electronically recording a defendant's custodial interrogation); *United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004) (declining to "enlarge *Miranda* so as to require the electronic recording of all interrogations"). Moreover, there is no evidence that the detectives purposefully or in bad faith failed to record the interview. The detectives each credibility testified that they thought the interview was being recorded and only discovered afterwards that the recording equipment was not working. The interrogation occurred in Wichita and the detectives had never conducted an interrogation there. The absence of an electronic recording is not a valid reason to suppress Defendant's statements. Therefore, Defendant's Motion to Suppress Statement should be denied.

### 2. Search of iPhone

Defendant argues the evidence obtained from the search from her phone should be suppressed because she did not voluntarily consent to the search. "A defendant's voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement." *United States v. Esquivel*, 507 F.3d 1154, 1160 (8th Cir. 2007). Consent is voluntary if it was "the product of an essentially free and unconstrained choice" by its maker. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "This determination depends upon the totality of the circumstances in a particular case, including both the characteristics of the accused and the details of the interrogation." *United States v. Chaidez*, 906 F.2d 377, 380-81 (8th Cir. 1990) (internal quotation omitted). "The same standard of voluntariness applies to consent for cell phone searches and for vehicle searches." *United States v. Avalos*, No. 4:16CR3038, 2017 WL 1050102, at *11 (D. Neb. Mar. 20, 2017).

The following characteristics of persons giving consent are relevant in assessing voluntariness: (1) their age, (2) intelligence and education, (3) whether they were intoxicated or under the influence of drugs, (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights, and (5) whether, due to previous arrests, they were aware of the protections afforded to suspects by the legal system. *Chaidez*, 906 F.2d at 381 (internal citations omitted). In examining the environment in which consent was given, courts should ask whether the individual who provided consent (1) was detained and questioned for a long or short time, (2) was threatened, intimidated or punished by police, (3) relied upon promises or misrepresentations made by police, (4) was in custody or under arrest when consent was given, (5) was in a public or a secluded place, or (6) either objected to the search or stood by silently while the search was performed. *Id.* (internal citations omitted). These factors are not to be applied mechanically but serve as a guide. *Id.*

The totality of the circumstances show that Defendant voluntarily consented to the search. Defendant was informed of her *Miranda* rights at the beginning of the interview and signed a waiver. She did not ask questions about the waiver and agreed to speak to the detectives. She did not ask for a lawyer or to terminate the interview. At the end of the interview, Defendant signed a separate consent to search form for her phone. The consent to search form asked Defendant to provide the passcode from her phone, which Defendant provided. The consent form indicated that Defendant was advised of her right to refuse consent and that officers told her that if she voluntarily consented to the search, anything discovered could be used against her. The consent form provided, right above Defendant's signature, that Defendant was voluntarily and intentionally consenting to allowing officers to search her property, and that her consent was being freely given and was not the result of any promises, threats, coercion, or intimidation. Further, as stated above, there is no evidence that Defendant was intoxicated or under the influence when she signed the consent to search form. Moreover, the interview was relatively short in duration, lasting only approximately an hour to an hour and a half. There is no evidence that officers intimidated or threatened Defendant or made promises or misrepresentations to obtain consent. Further, Defendant never revoked her consent to search the phone. Therefore, Defendant's motion to suppress evidence derived from the search of her phone should be denied.

Accordingly,

11

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Brian Buescher that Defendant's Motion to Suppress Statement (Filing No. 60) and Motion to Suppress Search of Phone (Filing No. 62) be denied.

Dated this 1st day of November, 2023.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.